ATTORNEYS FOR APPELLANT
Douglas C. Haney
Carmel, Indiana

George T. Patton, Jr.
Bryan H. Babb
Nicholas K. Kile
Indianapolis, Indiana

ATTORNEY FOR AMICI CURIAE
INDIANA ASSOCIATION OF CITIES & TOWNS
AND INDIANA MUNICIPAL LAWYERS ASSOCIATION
R. Thomas Bodkin
Evansville, Indiana

ATTORNEYS FOR AMICI CURIAE
TOWN OF PENDLETON, TOWN OF WHITESTOWN,
CITY OF MUNCIE, CITY OF ANDERSON,
AND TOWN OF FISHERS
Karl L. Mulvaney
Nana Quay-Smith
Kent D. Zepick
Indianapolis, Indiana

Douglas D. Church
Noblesville, Indiana

Christina J. Atkinson
Zionsville, Indiana

Frank E. Gilkison
Muncie, Indiana

David Allen Happe
Anderson, Indiana

ATTORNEY FOR AMICI CURIAE
PROFESSOR EMERITUS ROGER B. PARKS AND
PROFESSOR ROBERT S. KRAVCHUK
Paul Helmke
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES
Robert S. Schein
Andrew B. Buroker
Matthew R. Strzynski
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
SUMMERLAKES PROPERTY OWNERS ASSOCIATION,
INC., WESTON PLACE HOMEOWNERS' ASSOCIATION,
INC., LAURELWOOD HOMEOWNERS' ASSOCIATION,
INC., CROOKED STICK WEST HOMEOWNERS'
ASSOCIATION, INC., CEDAR POINT HOMEOWNERS'
ASSOCIATION, INC., AND GEIST UNITED OPPOSITION,
INC.
Lee B. McTurnan
Shannon D. Landreth
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 29S00-0608-CV-300

CITY OF CARMEL, INDIANA

*Appellant (Respondent below),*

v.

CERTAIN SOUTHWEST CLAY TOWNSHIP
ANNEXATION TERRITORY LANDOWNERS,

*Appellees (Petitioners below).*

———————————————————

Appeal from the Hamilton Superior Court No. 3, No. 29D03-0502-MI-188
The Honorable William J. Hughes, Judge

———————————————————

On Petition to Transfer Pursuant to Indiana Appellate Rule 56(A)

———————————————————

**June 27, 2007**

**Shepard, Chief Justice.**

The City of Carmel annexed territory in the southwest corner of Hamilton County representing roughly 3,400 parcels, and remonstrators contested the annexation. The organization leading the remonstrance negotiated favorable terms with the city and decided to settle. In a referendum among landowners, a majority voted in favor of settling. We conclude they were entitled to do so, and reverse the trial court's judgment which effectively held otherwise.

**Facts and Procedural History**

At Carmel's June 21, 2004 city council meeting, Carmel introduced ordinance C263 and a supporting fiscal plan for the purpose of annexing territory in southwest Clay Township. The territory is between 96th Street and 116th Street, and roughly west of U.S. 31 to the Boone County line. Carmel notified landowners in the territory on July 2, and published a notice in the Noblesville *Ledger* two weeks later. At about the same time, Carmel revised its fiscal plan to correct typos and published the updated version on Carmel's website. On November 24, the Carmel city council passed C263, and notice of its adoption was published two days later.

Over the following weeks, an organization of southwest Clay landowners called "No Ordinance for Annexation" ("NOAX") led a drive to obtain signatures from 65% of the effected landowners, the number necessary to file a remonstrance petition under Ind. Code § 36-4-3-11. On February 24, 2005, the landowners filed their remonstrance, after which Carmel and NOAX began settlement discussions. On September 6, Carmel and NOAX entered into a settlement agreement. Carmel incorporated the settlement terms into ordinance C263A, which the council adopted on October 7 with a fiscal plan revised to reflect those terms. NOAX conducted a referendum from September 12 to December 1, and the landowners voted in favor of the settlement by a count of 708 to 515.

On December 6, the trial court certified the remonstrance, finding that owners of 2,401 of the 3,440 parcels in southwest Clay, just under 70%, had signed the petition.[1] A few months later, the court held a hearing on the merits of the annexation, and NOAX appeared in support of Carmel. Three property owners entered individual appearances to continue opposing the transaction.

Concluding the ordinance and fiscal plan could not be amended after their original adoption, the court reviewed only the ordinance of November 2004. In written findings and conclusions, the trial court concluded that Carmel's original fiscal plan was too vague to satisfy the requirement of § 36-4-3-13(d)(2) to "explain how specific and detailed expenses will be funded." (Appellant's App. at 27-31.) While it could have ended the inquiry there, the court also determined that the remaining remonstrators had established an alternative method to challenge the proposed annexation under § 36-4-3-13(e). The trial court granted the remonstrance petition and ordered that Carmel may not annex the territory in southwest Clay.

Carmel appealed, contending that the Indiana Code allows remonstrators and annexing municipalities to settle, thereby amending the ordinance and fiscal plan to do so, prior to the evidentiary hearing contemplated by § 36-4-3-12. (Appellant's Br. at 16-25.) The City also

---

[1] Of the 708 landowners who voted in favor of the settlement agreement in the referendum, 546 had signed the original remonstrance petition. (Petr.'s Ex. 117.)

contends that the court improperly reviewed the fiscal plan and that its ordinance and fiscal plan (both original and amended) meet the statutory standard. (Id. at 25-37.)

The three landowners countered that the trial court was right to freeze the fiscal plan for the purpose of determining legal sufficiency. (Appellee's Br. at 11-30.) They also argue that the court correctly determined that Carmel's original fiscal plan did not satisfy § 36-4-3-13(d) and that alternative grounds exist that prohibit the annexation from going forward. (Id. at 31-44.)

A substantial number of *amici curiae* have filed briefs supporting the two sides. We granted transfer under Ind. Appellate Rule 56(A), permitting a direct appeal.

## I. Municipality May Amend Annexation Ordinance and Plan

Indiana adopted its first annexation statute in 1824. It allowed for virtually automatic annexation of new developments adjacent to existing municipalities. Bradley v. City of New Castle, 764 N.E.2d 212, 215 n.2 (Ind. 2002) (citing "An Act providing for the Incorporation of Towns," 1824 Ind. Rev. Stat., ch. CXI § 14, at 417 (Jan. 30, 1824)).[2]

Indiana's annexation laws have evolved over time, but the object of annexation has remained the same: "to permit annexation of adjacent urban property." Rogers v. Mun. City of Elkhart, 688 N.E.2d 1238, 1242 (Ind. 1997). The statutory framework has also retained the same three stages: "(1) legislative adoption of an ordinance annexing of certain territory and pledging to deliver certain services within a fixed period, (2) an opportunity for remonstrance by affected landowners, and (3) judicial review." City of Hobart v. Chidester, 596 N.E.2d 1374, 1375 (Ind. 1992).

---

[2] We held over 100 years ago that "annexation of territory to a city is not a taking of the property, nor does it deprive any person of his property." Taggart v. Claypool, 145 Ind. 590, 596, 44 N.E. 18, 20 (1896). "Property owners therefore have no vested interest in the maintenance of municipal boundaries at any particular location." Bradley, 764 N.E.2d 212, 215 (Ind. 2002).

**Fiscal Plan Amendments**

As a threshold issue we must determine what happens if a fiscal plan is amended after a remonstrance is filed, as in this case. The trial court concluded that a fiscal plan is frozen as of the adoption of the annexation ordinance that it supports. (App. at 23.) In other words, the court held that the fiscal plan supporting the original ordinance could not be amended – even in light of the settlement reached between Carmel and NOAX, confirmed by a majority vote of property owners.

The trial court acknowledged that Indiana law has long been to the contrary. (Id. at 18-19.) Bradley, 764 N.E.2d at 219-21 (city allowed to amend and supplement fiscal plan at evidentiary hearing); Chidester, 596 N.E.2d at 1378 (trial court should have considered evidence at trial about adequacy of plan). The Code instructs courts to enter judgment "according to the evidence that either party may introduce" at the evidentiary hearing. Ind. Code Ann. § 36-4-3-12 (West 2006). If everything had to be contained in the written fiscal plan, then it would not be necessary to conduct a section 12 hearing. Bradley, 746 N.E.2d at 219; Chidester, 596 N.E.2d at 1378 ("There would be no need for an evidentiary hearing . . . if all proof . . . had to be set out in the written plan. We cannot read legislative intent as requiring the courts to ignore the evidence adduced at the hearing.").

The three landowners have argued that a 1999 amendment altered this rule. The amendment gives us a statute that says "the municipality *shall* establish and adopt the written fiscal plan *before mailing the notification to landowners in the territory proposed to be annexed*." Ind. Code Ann. § 36-4-3-3.1(c) (emphasis added). This section, however, does not materially differ from the former requirement that the written fiscal plan be developed and established "*as of the date of passage of the annexation ordinance*." Ind. Code. Ann. § 36-4-3-13(d) (West Supp. 1997) (emphasis added). Both statutes require that the written fiscal plan be developed prior to the evidentiary hearing, and neither statute prohibits amendments. The trial court should have considered the settlement and the fiscal plan supporting the amended ordinance.

5

## II. The Amended Annexation Satisfied the Statute

We now review the trial court's findings and conclusions as they bear on Carmel's amended annexation ordinance and revised fiscal plan.

Annexation is subject to judicial review only so far as the General Assembly has authorized it by statute, and "[t]he larger object of the annexation statute is, as it has always been, to permit annexation of adjacent urban territory." Rogers, 688 N.E.2d at 1242. Our review of the trial court's special findings is limited to reviewing the sufficiency of the evidence for issues of fact, and then looking to the record for evidence favorable to judgment. Bradley, 764 N.E.2d at 216. We do not set aside findings or judgments unless they are clearly erroneous, but we review questions of law *de novo*. Id.

### A. What a City Has to Prove

When a remonstrance is certified, the trial court must conduct a hearing and determine whether the annexation may go forward "according to the evidence that either party may introduce." Ind. Code Ann. § 36-4-3-12(a). The municipality bears the burden of showing that it has complied with the statutory conditions for annexation. Bradley, 764 N.E.2d at 216.

Indiana Code § 36-4-3-13 lists the prerequisites for annexation. If the municipality meets the requirements of subsections 13(b) or 13(c) and subsection 13(d), the court must order the annexation to proceed. Even if those findings are favorable to the municipality, however, the remonstrators can still prevail if they establish grounds listed in subsection 13(e). Ind. Code Ann. § 36-4-3-13(a).

*1. Subsections 13(b) or 13(c).* An annexing municipality must satisfy either subsection 13(b) or 13(c), both of which reflect the legislature's desire for some contiguity between the city and the annexation territory. In addition to contiguity, subsection 13(b) requires one of three conditions to exist relating to the extent the territory is in use. Id. § 36-4-3-13(b). Subsection

13(c) takes a different approach. The city must show that at least one-fourth of the aggregate external boundaries of the annexation territory coincide with the city's boundaries. The city must also demonstrate that "the territory sought to be annexed is needed and can be used by the municipality for its development in the reasonably near future." Id. § 36-4-3-13(c).

The trial court determined that Carmel's proposed annexation satisfies not just one, but both of these prerequisites. There is no challenge on appeal to this conclusion.

2. *Subsection 13(d).* A city meets its burden under subsection 13(d) when it "establishes that [it] has developed and adopted a written fiscal plan and has established a definite policy, by resolution of the legislative body." Id. § 36-4-3-13(d). The fiscal plan must show:

> (1) The cost estimates of planned services to be furnished to the territory to be annexed [including] . . . itemized estimated costs for each municipal department or agency.
> (2) The method or methods of financing the planned services. The plan must explain how specific and detailed expenses will be funded and must indicate the taxes, grants, and other funding to be used.
> (3) The plan for the organization and extension of services [including] . . . the specific services that will be provided and the dates the services will begin.
> (4) That planned services of a noncapital nature . . . will be provided to the annexed territory within one (1) year after the effective date of annexation . . . in a manner equivalent in standard and scope to those . . . provided . . . within the corporate boundaries . . . .
> (5) That services of a capital improvement nature . . . will be provided to the annexed territory within three (3) years after the effective date of the annexation in the same manner as those . . . provided . . . within the corporate boundaries . . . .

Id.

The requirement for a written fiscal plan serves three purposes in annexation law:

> First, the publication of a written plan permits landowners to make an intelligent decision about whether to accept annexation or remonstrate. Second, requiring a written plan makes the opportunity for remonstrance and judicial review more realistic. As a practical matter, more than vague promises are needed for a court to test a city's ability to provide like services to the annexed territory. Third, a fiscal plan needs to be in writing to protect the right of landowners to institute proceedings to force an annexing city to provide the services promised under the plan.

7

Chidester, 596 N.E.2d at 1377-78; see also Bradley, 764 N.E.2d at 220; City of Fort Wayne v. Certain Sw. Annexation Area Landowners, 764 N.E.2d 221, 225 (Ind. 2002). In assessing a municipality's ordinance and plan, a court should keep in mind that annexation is "a legislative function." Rogers, 688 N.E.2d at 1239. Moreover, "a trial court hearing a remonstrance is not an examiner conducting an audit of a challenged fiscal plan. Rather, it should focus on whether that plan represents a credible commitment by the municipality to provide the annexed area with comparable capital and non-capital services." Bradley, 764 N.E.2d at 216.

The trial court concluded that Carmel's original fiscal plan failed to meet the requirements of subsection (d)(2). It criticized the plan for not providing the funding methods for services from each of Carmel's city departments or more specific estimates of expenses. (App. at 28.) This conclusion is not supported by the evidence. The plan's fiscal projections contain both a breakdown of expenditures by department and a description of which city funds will be used to pay for the overall package of services.[3] The projections show the various forms of revenue expected to be collected in connection with the proposed annexation. They net out expenses and revenue to show the overall impact, demonstrating that revenue from the annexation territory will be a significant source of funding for services to the territory.

Carmel's revised ordinance and fiscal plan satisfy the general purposes assigned to them under the Code. As for giving notice so that those affected can make a decision about their interests, the landowners stand before us in this proceeding as living proof that the first purpose has been fulfilled. As to the second, Carmel's fiscal plain explains in considerable detail its strategy for providing services to southwest Clay (detail sufficiently minute that counsel understandably complain about some of the print size). The level of detail is both ample for judicial review and sufficient to test the future fulfillment of the pledge of service. To mention a few examples, Carmel plans to hire at least six new police officers (at $90,000 each), at least four new communications center employees ($48,000 each), and one new city court employee ($65,000 – $70,000), and the City will provide "a combination of tandem axle trucks, single axle

---

[3] The original fiscal plan contains an even more detailed breakdown of expenses per department than the latest revised plan. Compare (App. at 166-69) (original fiscal plan), with (App. at 260-70) (amended fiscal plan). While our decision rests soundly on the revised version, it would not differ were we required to examine only the original figures, as the trial court did.

8

trucks, pick ups and street sweepers" for road maintenance ($780,000). (App. at 152-54, 156-58.) The three landowners do not contest the accuracy of any of these calculations on appeal, nor do they contend that the services contemplated are less than those provided the present city residents. By contrast, at the end of the day those who led the remonstrance, backed up by a majority vote, told the court that they regarded the plan as a credible commitment.[4] City of Fort Wayne, 764 N.E.2d at 226-28.

The general question is whether services similar to those offered in the existing city will be provided and whether the annexing municipality will be able to finance them. The trial court noted that "Carmel did demonstrate the general financial wherewithal to pay for the SW Clay annexation." (App. at 31.) In light of the failure of the landowners to contest the adequacy of the services planned and the trial court's finding that the city's finances were sufficient to carry them out, the trial court's judgment that the plan did not meet the requirements of subsection 13(d) was clear error.

### B. Effect of Settlement on Alternative Objection

A relatively new provision of the Code stipulates that even if a municipality satisfies all the prerequisites of section 13, aggrieved landowners can still defeat the annexation. The Code requires that the court prohibit the annexation if it

> finds that *all* of the conditions set forth in clauses (A) through (D) and, if applicable, clause (E) exist in the territory proposed to be annexed:
>
> (A)  The following services are adequately furnished by a provider other than the municipality seeking the annexation:
>   (i)  Police and fire protection.
>   (ii)  Street and road maintenance.
> (B)  The annexation will have a significant financial impact on the residents or owners of land.
> (C)  The annexation is not in the best interests of the owners of land in the territory proposed to be annexed as set forth in subsection (f).
> (D)  One (1) of the following opposes the annexation:

---

[4] These commitments appear plainly in the 21-page Wabash Scientific report submitted with the original fiscal plan and retained by the amended ordinance. (See App. at 144-65, 242.)

(i)    At least sixty-five percent (65%) of the owners of land in the territory proposed to be annexed.

(ii)   The owners of more than seventy-five (75%) in assessed valuation of the land in the territory proposed to be annexed.

Evidence of opposition may be expressed by any owner of land in the territory proposed to be annexed.

Ind. Code Ann. § 36-4-3-13(e)(2) (emphasis added).

The trial court found conditions (A) through (D) were all satisfied, and condition (E) not applicable. Some of these findings pose interesting questions. As to condition (A), for example, Clay Township presently pays Carmel to provide fire protection in the annexed area. Does this mean that "a provider other than the municipality seeking the annexation," to quote section 13(e)(2)(A), is providing fire protection?

This conundrum can wait for another day, inasmuch as the remaining remonstrators have not proven condition (D).

Condition (D) contemplates a showing that at least 65% of the landowners oppose the annexation. Section 13(e)(2)(D)(i). The trial court concluded that Condition (D) was met because 65% opposed the annexation when they signed on for the initial remonstrance. (App. at 34-35.) The appropriate consideration should have been whether 65% of the landowners continued to oppose the annexation. Condition (D) complements the rest of the statutory arrangement only if understood as a testing of landowner sentiment after the rest of the process has run its course.

NOAX President Fred Yde testified at the evidentiary hearing that the only way he secured enough signatures for the remonstrance petition was to promise to negotiate with Carmel for better terms of annexation. (Id. at 340-41; Appellant's Br. at 35; Trial Tr. at 262, 270-77.) The trial court found that he succeeded, declaring that the terms of the amended ordinance benefited both the remonstrators and the municipality.[5] (App. at 23.) Those new and favorable

---

[5] In the settlement agreement supporting the amended ordinance, Carmel committed to spending up to $40 million on the improvement of roads and intersections; to improving drainage; to burying overhead lines; to ensuring additional input from southwest Clay residents; to the appointment of a southwest Clay resident to the Planning

10

terms led to the settlement in support of the amended ordinance. There is no need to speculate about how many of the original remonstrators supported the settlement. The referendum shows that it is mathematically impossible to meet the 65% opposition requirement. (Appellant's Br. at 36; Petr.'s Ex. 117) (546 of the original remonstrators supported the amendment, reducing the number of certified remonstrators to 1,855 – far below 2,236 or 65%).

To defeat an otherwise valid ordinance, all conditions of section 13(e)(2) must be met. They were not.

## Conclusion

We reverse and direct judgment for the City.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.

---

Commission; to a three year postponement of the annexation and three year property tax abatements at highest level permitted; to maintaining method for calculating fire protection charges; and to maintaining southwest Clay as a voting block for council elections. (Appellant's Br. at 34.)